**Lenna RANSBURG d/b/a Twin Lakes Apartments, Appellant–Plaintiff,**

v.

**Barbara L. RICHARDS, Appellee– Defendant.**

No. 29A05–0101–CV–25.

Court of Appeals of Indiana.

June 20, 2002.

Michael R. Bain, Smith, Fisher, Maas & Bishop, Indianapolis, IN, Attorney for Appellant.

Jeffrey S. Zipes, Coots, Henke & Wheeler, Carmel, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Lenna Ransburg, d/b/a Twin Lakes Apartments ("Ransburg"), brings this interlocutory appeal to challenge the trial court's denial of her summary judgment motion in a negligence action filed by her tenant, Barbara Richards. We affirm.

### Issue

The dispositive issue is whether the exculpatory clause contained in the residential lease between the parties is void as against public policy and whether, as a result, the denial of summary judgment in favor of Ransburg was proper.

### Facts

In May 1995, Richards leased an apartment at Twin Lakes. The written lease agreement provided that Twin Lakes would "gratuitously" maintain the common areas. Appendix p. 78. The lease agreement further provided that Richards' use of the Twin Lakes facilities, including the parking lot, would be at "[her] own risk." Appendix p. 78. In addition, the lease agreement provided that Twin Lakes was not liable for damages to persons or property even if such damages were caused by Twin Lakes' negligence. Specifically, the lease contained the following clause:

> Lessor shall not be liable for damages to person or property sustained by the Lessee, his family, servants, agents or visitors, due to the building or any of the appurtenances being out of repair or arising from leakage or stoppage of gas, plumbing, steam, water, sewer pipes or from defective wiring or from defective construction of any of the aforesaid. It is agreed that the common areas and grounds, on which the demise premises are located, recreational facilities, laundry rooms and equipment, hallways, walkways, stairways, *parking lots,* lawns and all other areas and equipment to be used in common by all occupants of the apartment building and grounds, are provided and maintained gratuitously by Lessor, and that their use is not appurtenant to the premises hereby leased; and *the Lessee hereby expressly agrees that the same shall be made use of Lessee, his family, servants, agents or visitors, such use shall be at his, or their own risk, and that the lessor shall, in no event, be, or become liable thereby for any loss, or damage, to persons or property,* whether such property be contained in the storerooms, in the common areas, in the leased premises or in any other portion of said building and grounds, *even though such loss or damage shall be caused by the negligence of Lessor,* or its agents, servants, or employees.

Appendix p. 78 (emphasis added).

In the early morning hours of January 28, 1999, it snowed approximately two inches. When Richards left her apartment that morning, she noticed that the sidewalk had been cleared. It also appeared that the parking lot had been plowed and cleared. As Richards walked across the

parking lot to her car, she slipped and fell on snow-covered ice.

Richards subsequently filed a negligence action against Ransburg. Ransburg responded with a summary judgment motion wherein she alleged that because of the non-liability clause in the lease, Richards had "waived any right that she ha[d] to complain of injuries or damages...." Appendix p. 24. In her brief in opposition to Ransburg's motion, Richards contended that there were genuine issues of material fact with regard to whether Richards had assumed a duty to remove the snow and ice. The trial court denied Ransburg's motion.

## Analysis

Ransburg argues that the trial court erred in denying her summary judgment motion because Richards waived any claim to damages. She claims that summary judgment should have been granted in her favor because "the law requires that the clear and unambiguous terms of the May 2, 1995, Residential Lease Agreement and corresponding non-liability clause entered into by [Richards] and [Ransburg] be enforced as a matter of law." Appellant's Brief p. 6. In support of her argument, she relies on basic contract principles and Indiana's recognition of the validity of exculpatory clauses, where parties are allowed to agree in advance that one is under no obligation of care for the benefit of the other and shall not be liable for the consequences of negligent conduct. *See, e.g., LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 360 N.E.2d 605 (1977). She maintains that in the absence of legislation to the contrary, it is not against public policy to enter into an agreement that exculpates one from the consequences of her own negligence. *See Marshall v. Blue Springs Corp.,* 641 N.E.2d 92 (Ind.Ct. App.1994).

■ Our standard of review for the denial of a summary judgment motion is the same as it was for the trial court. *Miller v. Grand Trunk Western R.R., Inc.,* 727 N.E.2d 488, 491 (Ind.Ct.App.2000). We must determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Id.* We must consider the pleadings and evidence designated pursuant to Indiana Trial Rule 56(c) without deciding their weight or credibility. *Id.* Summary judgment should be granted only if such evidence shows that there is no genuine issue of material fact and that judgment is warranted as a matter of law. *Id.* Summary judgment is generally inappropriate in negligence actions. *Miles v. Christensen,* 724 N.E.2d 643, 645 (Ind.Ct. App.2000), *trans. denied.*

■ Resolving the question of whether this lease provision is void as against public policy turns on fairly balancing the parties' freedom to contract against the policy of promoting responsibility for damages caused by one's own negligent acts. Indiana courts have long recognized and respected the freedom to contract. *Trotter v. Nelson,* 684 N.E.2d 1150, 1152–53 (Ind.1997). We recognize a "very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties." *Id.* (quoting *Continental Basketball Assoc. v. Ellenstein Enter., Inc.,* 669 N.E.2d 134, 139 (Ind.1996)). As a general rule, the law allows persons of full age and competent understanding the utmost liberty of contracting, and their contracts, when entered into freely and voluntarily, are enforced by the courts. *Candlelight Prop., LLC v. MHC Operating Ltd. P'ship,* 750 N.E.2d 1, 10 (Ind.Ct.App. 2001). It is in the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract. *Peoples Bank & Trust Co. v. Price,*

714 N.E.2d 712, 716 (Ind.Ct.App.1999), *trans. denied.* However, in certain circumstances a court may declare an otherwise valid contract unenforceable if it contravenes the public policy of Indiana. *Trotter,* 684 N.E.2d at 1152–53.

As aptly stated by our supreme court, "[p]ublic policy is a term not easily defined." *Id.* In *Trotter,* the supreme court stated that in the past, Indiana courts have noted that we first look to the Constitution, the legislature, and the judiciary for explicit declarations of public policy. *Id.* In the absence of such a declaration, we next look to whether it can be clearly shown that the agreement has a tendency to injure the public, or is against the public good, or is inconsistent with sound policy and good morals as to the consideration or as to the thing to be done or not to be done. *Id.* The supreme court further noted that whether a contract is against public policy in a particular situation would be a question of law dependent on the circumstances of the particular case. *Id.*

The *Trotter* court then acknowledged that this approach had been reiterated in recent cases:

> Recently, this Court re-emphasized this analysis. We categorized three situations where courts have refused to enforce private agreements on public policy grounds: "(i) agreements that contravene statute; (ii) agreements that clearly tend to injure the public in some way; and (iii) agreements that are otherwise contrary to the declared public policy of Indiana." We further noted that, depending on the category, we must approach the analysis in different manners. If an agreement is in direct contravention of a statute, "then the court's responsibility is to declare the contract void." If, however, the agreement falls into the more amorphous category of "otherwise contrary

to the declared public policy of Indiana," then the court must balance five relevant factors: (i) the nature of the subject matter of the contract; (ii) the strength of the public policy underlying the statute; (iii) the likelihood that refusal to enforce the bargain or term will further that policy; (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties relative bargaining power and freedom to contract.

*Id.* (citations and footnote omitted). The case before us falls in the "amorphous" category of "otherwise contrary to the declared public policy of Indiana," and, therefore, we must consider the five factors in evaluating this provision of the lease.

■ Indiana recognizes the general validity of exculpatory clauses. *Marsh v. Dixon,* 707 N.E.2d 998, 1000 (Ind.Ct.App. 1999), *trans. denied.* We have stated:

> Parties are permitted to make such contracts so long as they are knowingly and willingly made and free from fraud. No public policy exists to prevent such contracts. However, exceptions exist where the parties have unequal bargaining power, the contract is unconscionable, or the transaction affects the public interest such as utilities, carriers, and other types of businesses generally thought to be suitable for regulation or which are thought of as a practical necessity for some members of the public.

*General Bargain Ctr. v. American Alarm Co.,* 430 N.E.2d 407, 411–12 (Ind.Ct.App. 1982). Exculpatory clauses are generally enforced and are not void on public policy grounds unless one of the exceptions noted is present. *Id.*

*Franklin Fire Ins. Co. v. Noll,* 115 Ind. App. 289, 58 N.E.2d 947 (1945), is an example where many years ago we found a

clause in a commercial lease releasing the lessor from liability to be binding, enforceable, and not void as an unconscionable contract. In that case, the lessee signed a lease releasing the landlord from liability for leaking water. The lessee sued for damages resulting from water damage caused by leaky pipes. In affirming the trial court's judgment in favor of the landlord, we held:

> Stipulations between a landlord and tenant, determining which shall bear a loss arising from nonrepair or misrepair of the tenement, and which shall be immune, are not matters of public concern. Moreover, the two stand upon equal terms; neither the one nor the other is under any form of compulsion to make the stipulations; either may equally well accept or refuse entry into the relationship of landlord and tenant. We think it clear that public policy does not condemn the immunity clause voluntarily agreed upon by the parties.

*Id.* at 951. Ransburg argues that *Franklin Fire* is still the law in Indiana and must be applied to this case, which would result in the non-liability clause in the lease absolving Ransburg from any liability for the incident.

The facts of the *Franklin Fire* case are clearly distinguishable from those before us. The dispute in that case involved a commercial lease. To that end, the parties were of equal bargaining power because they were both corporate entities, and the lessee was not seeking a basic necessity of life, namely shelter. The damages for which the lessee sought to recover were for the loss of commercial inventory, not for personal injuries. Our supreme court has more recently held a release in a commercial lease enforceable and not against public policy, but emphasized that the lease concerned a commercial matter:

> Nothing in the municipal ordinance at issue here restricts the ability of an owner to delegate responsibility for sprinkler systems. And, given the nature of the subject matter and the parties' relative bargaining power and freedom to contract, we have little difficulty agreeing with the Court of Appeals that, on these facts, a contract shifting responsibility for sprinkler systems from owner to tenant is not void as against public policy. The subject matter of this contract is the lease of commercial real estate. Commercial real estate leases commonly allocate obligations and risks between owner and tenant. For example, Indiana Code § 6–1.1–2–4 (1993) imposes liability on the owner of real property for property taxes, but the tenant is customarily required to pay its share of real estate taxes on leased commercial property. We also agree that there is no evidence of inequality of bargaining power or of impingement on freedom to contract here. We hold that on this record, there was no public policy impediment to the parties agreeing that tenant would be responsible for maintaining the fire sprinkler system.

*Fresh Cut, Inc. v. Fazli,* 650 N.E.2d 1126, 1130 (Ind.1995) (citations omitted). The *Franklin Fire* court also limited its conclusion that the lease was not unconscionable by stating, "We do not say that there may not be facts and circumstances which could be averred, but not now before us, upon which the court would be warranted in holding that a similar provision contained in a lease would be null and void as unconscionable." *Id.* at 289, 58 N.E.2d at 949.

Furthermore, in finding that the lease was not against public policy, the *Franklin Fire* court relied in part upon a New York case that held that leases were not matters of public concern. *See Kirshenbaum v. General Outdoor Advertising Co.,* 258 N.Y. 489, 180 N.E. 245, 247 (1932). Since then

New York has enacted a statute prohibiting exculpatory clauses such as the one found in this case as a violation of public policy.[1] Therefore, although the *Franklin Fire* case may still hold some precedential and persuasive authority in commercial lease cases, we find that it is not controlling in a case concerning a residential lease.

We considered an exculpatory clause in a residential lease in *Vertucci v. NHP Mgmt. Co.*, 701 N.E.2d 604 (Ind.Ct.App. 1998), where a tenant sued the landlord for injuries sustained when she was sexually assaulted at her apartment complex's swimming pool by a non-resident of the complex. On appeal, the tenants argued that the trial court erred in granting summary judgment in favor of the landlord because their designated evidence raised genuine issues of material fact concerning whether the landlord gratuitously assumed a duty to protect them from the criminal actions of non-residents, whether the landlord breached this duty, and whether the landlord's breach proximately resulted in the sexual assault. The landlord claimed that the lease disclaimed any liability on its part for injuries to the tenants, that it had no common law duty to protect against an unforeseeable criminal attack by a third party, and that it did not assume such a duty. The lease agreement signed by the tenants contained the following provision:

> Tenant agrees that Landlord, its employees, or agents shall not be liable for any damage or injury to Tenant, Tenant's family, agents, employees, or guests, or to any person entering the premises or the building of which the leased premises are a part, for injury to person or property arising from theft, vandalism, fire, or casualty occurring in the premises or the building. LANDLORD IS NOT RESPONSIBLE FOR, AND DOES NOT GUARANTEE, THE SAFETY OF TENANT, TENANT'S GUESTS, FAMILY, EMPLOYEES, AGENTS, OR INVITEES. TENANT AGREES TO LOOK SOLELY TO THE PUBLIC POLICE AUTHORITIES FOR SECURITY AND PROTECTION. ANY SECURITY THAT MAY BE PROVIDED IS SOLELY FOR THE PROTECTION OF LANDLORD'S PROPERTY....

*Id.* at 606 (emphasis in original). The parties disagreed as to whether the sexual assault was a "casualty" within the meaning of this provision. We held that an intentional act such as the assault would not be considered a "casualty," and, therefore, that the exculpatory clause did not prevent the landlord from having or assuming a duty to protect the tenant from the criminal actions of a third party. *Id.*

Although the *Vertucci* case involves a residential lease, it too is distinguishable from the case before us today. The exculpatory clause at issue in *Vertucci* sought to insulate the landlord from liability for "injury to person or property arising from theft, vandalism, fire, or casualty occurring in the premises or the building." *Id.* As such, the landlord did not seek a blanket release for its own negligence as Ransburg did here. In addition, the enforceability of the clause as a matter of public policy was not at issue and was not addressed. In-

---

1. *See* N.Y. Real Property § 5–321, which states:

   Every covenant, agreement or understanding in or in connection with or collateral to any lease of real property exempting the lessor from liability for damages for injuries to person or property caused by or resulting from the negligence of the lessor, his agents, servants or employees, in the operation or maintenance of the demised premises or the real property containing the demised premises shall be deemed to be void as against public policy and wholly unenforceable.

stead, the tenants merely sought to have the assault fall outside the scope of the term "casualty" such that the exculpatory clause would not prevent a negligence action against the landlord. We agreed, and permitted the negligence action to proceed. We never addressed the question of whether the lease provision violated public policy because the provision did not attempt to insulate the landlord from damages caused by its own negligence. The *Vertucci* holding is not controlling in evaluating the enforceability of the clause in the instant case.

Because the question of whether exculpatory clauses in residential leases insulating landlords from liability for personal injuries purportedly caused by the landlords' negligence are void as against public policy has never been specifically addressed in Indiana, we look to the other jurisdictions that have considered this issue and reached differing conclusions. There is no majority rule on this issue, "only numerous conflicting decisions, decisions concerned with contracts of indemnity, cases relating to property damage under business leases, and a disposition of the courts to emasculate such exculpatory clauses by means of strict construction." *McCutcheon v. United Homes Corp.*, 79 Wash.2d 443, 447–48, 486 P.2d 1093, 1096 (Wash.1971).

The rationale underlying the argument for enforceability of such clauses has often been based upon the doctrine of freedom of contract and the view that lease terms are a purely private matter. This reasoning has been summarized as follows:

[T]he public policy in apparent conflict with the freedom of contract argument in real-estate lease exculpatory clause cases, namely, that a landlord should be liable for the negligent breach of a duty which is owed to his tenant, is subservient to the doctrine that a person has the right to freely contract about his affairs. Some cases, especially the older ones, have reasoned that the relationship of landlord and tenant is in no event a matter of public interest, but is purely a private affair, so that such clauses cannot be held void on purely public policy grounds.

John D. Perovich, Annotation, *Validity of Exculpatory Clause in Lease Exempting Lessor from Liability*, 49 A.L.R.3d 321, 325 (1973).

However the application of these principles in all contexts is not warranted. As stated by the Supreme Court of Wisconsin:

The unconsidered application of the principle of freedom of contract, even when accompanied by the rules of strict construction, is not always justified where there are extenuating circumstances which may affect the degree to which that freedom actually exists. Therefore, we are of the opinion that the better view is that which takes into account the actual effect of the particular clause in question and that the facts and circumstances attendant upon the creation of the landlord-tenant relationship.

*College Mobile Home Park & Sales v. Hoffmann*, 72 Wis.2d 514, 519, 241 N.W.2d 174, 177 (1976). A growing number of states have held similar exculpatory clauses to offend public policy concerns and to be unenforceable.[2]

---

**2.** *See, e.g., Stanley v. Creighton Co.*, 911 P.2d 705 (Colo.App.1996); *Crawford v. Buckner*, 839 S.W.2d 754 (Tenn.1992); *Taylor v. Leedy & Co.*, 412 So.2d 763 (Ala.1982); *Cappaert v. Junker*, 413 So.2d 378 (Miss.1982); *Henrioulle v. Marin Ventures, Inc.*, 20 Cal.3d 512, 573 P.2d 465, 143 Cal.Rptr. 247 (1978) (en banc); *College Mobile Home Park & Sales, Inc. v. Hoffmann*, 72 Wis.2d 514, 241 N.W.2d 174 (1976); *Kinkaid v. Avis Rent–A–Car Sys.*, 281 So.2d 223 (Fla.App.1973); *Crowell v. Housing Auth. of Dallas*, 495 S.W.2d 887

In 1971, the Supreme Court of Washington held that a lease provision exculpating the landlord of a multifamily dwelling complex from liability for injury to lessee or anyone entering the premises was void against public policy. *McCutcheon,* 79 Wash.2d at 447–48, 486 P.2d at 1096. In so holding, the court found:

In the landlord-tenant relationship it is extremely meaningful to require that a landlord's attempt to exculpate itself, from liability for the result of its own negligence, not fall greatly below the standard of negligence set by law. As indicated earlier, a residential tenant who lives in a modern multi-family dwelling complex is almost wholly dependent upon the landlord for the reasonably safe condition of the "common areas". However, a clause which exculpates the lessor from liability to its lessee, for personal injuries caused by lessor's own acts of negligence, not only lowers the standard imposed by the common law, it effectively destroys the landlord's affirmative obligation or duty to keep or maintain the "common areas" in a reasonably safe condition for the tenant's use.

When a lessor is no longer liable for the failure to observe standards of affirmative conduct, or for any conduct amounting to negligence, by virtue of an exculpatory clause in a lease, the standard ceases to exist. In short, such a clause destroys the concept of negligence in the landlord-tenant relationship. Neither the standard nor negligence can exist in abstraction.

*Id.* The court further reasoned:

Furthermore, one must ignore present day realities to say that such an exculpatory clause, which relieves a lessor of liability for personal injuries caused by its own negligence, is purely a "personal and private affair" and "not a matter of public interest."

We no longer live in an era of the occasional rental of rooms in a private home or over the corner grocery. In the relatively short span of 30 years the public's use of rental units has expanded dramatically . . . It takes no imagination to see that a business which once had a minor impact upon the living habits of the citizenry has developed into a major commercial enterprise directly touching the lives of hundreds of thousands of people who depend upon it for shelter. Thus, we are not faced merely with the theoretical duty of construing a provision in an isolated contract specifically bargained for by one landlord and one tenant as a purely private affair. Considered realistically, we are asked to construe an exculpatory clause, the generalized use of which may have an impact upon thousands of potential tenants. Under these circumstances, it cannot be said that such exculpatory clauses are "purely a private affair" or that they are "not a matter of public interest."

*Id.* at 449–50, 486 P.2d at 1096–97 (footnotes omitted).

More recently, the Tennessee Supreme Court held a clause in a tenant's residential lease limiting the landlord's liability for negligence to its tenants was void as against public policy. *Crawford v. Buckner,* 839 S.W.2d 754 (Tenn.1992). In so doing, the court concluded that a residen-

(Texas 1973); *McCutcheon v. United Homes Corp.,* 79 Wash.2d 443, 486 P.2d 1093 (1971); *Tenants Council of Tiber Island–Carrollsburg Square v. DeFranceaux,* 305 F.Supp. 560 (D.D.C.1969); *Galligan v. Arovitch,* 421 Pa.

301, 219 A.2d 463 (1966); *Kuzmiak v. Brookchester, Inc.,* 33 N.J.Super. 575, 111 A.2d 425 (1955); *Papakalos v. Shaka,* 91 N.H. 265, 18 A.2d 377 (1941).

tial lease is a matter of public concern, not a private matter. *Id.* at 757. The court noted that the type of business was an area suitable for public regulation, particularly in states such as Illinois, Maryland, Massachusetts, and New York that had enacted legislation regulating the residential landlord-tenant relationship. The court further noted that residential landlords offer shelter, which is a basic necessity of life, to more than a million people statewide and stated:

> [I]t is self-evident that a residential landlord is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. In addition, a residential landlord holds itself out as willing to perform a service for any member of the public who seeks it.

*Id.* at 758. The court also stated that as a result of the essential nature of the service and the economic setting of the transaction, a residential landlord has a decisive advantage in bargaining strength against any member of the public who seeks its services. Due to its superior bargaining position, a residential landlord confronts the public with a standardized adhesion contract of exculpation, which contains no provision whereby a tenant can pay additional reasonable fees to obtain protection from the landlord's negligence. The court found that by definition a residential lease places the person and the property of the tenant under the control of the landlord, subject to the risk of carelessness by the landlord and its agents.

Other courts have emphasized the unequal bargaining power between residential landlords and tenants. As one judge put it:

> A tenant must live somewhere. The tenant has no meaningful choices. He can accept this landlord or go to another landlord who charges the same rent and asks the tenant to sign the same standard form lease. In other words, the modern standard form lease is in essence an adhesion contract.... A reasonable person with equal bargaining power would not accept a term whereby they or their children may be injured or killed, and they would have no recourse against the guilty party.

*Taylor v. Leedy & Co.*, 412 So.2d 763, 766 (Al.1982) (Faulkner, J. concurring specially). That judge went on to quote the Justice Frankfurter, stating in part:

> But is there any principle which is more familiar or more firmly embedded in the history of Anglo–American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other? These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a "bargain" in which one party has unjustly taken advantage of the economic necessities of the other.

*Id.* (quoting *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942) (Frankfurter, J. dissenting)).

Several cases emphasize that exculpatory clauses such as the one at issue in this case are public matters rather than private terms, primarily because the rental indus-

try provides a basic necessity of life, shelter, to thousands of people.[3]

A lease is no longer an isolated contract between one landlord and one tenant. The size of the rental industry is so great that construction of an exculpatory clause has an impact on thousands of citizens. Furthermore, the public has an interest in the quality of housing offered for rent to all members of the public. Enforcement of exculpatory clauses in personal injury cases results in great harm to the public, and thus these clauses do not fall within the exception to the rule that a party may not contract against his or her own negligence.

*Taylor*, 412 So.2d at 765 (Faulkner, J. concurring specially).

■■■ We agree with the reasoning in these cases. We also point out that an exculpatory clause of this type contravenes the long established common law rules of tort liability. At common law in Indiana, the landlord has a duty of reasonable care that the common ways and areas are maintained in a reasonably fit and safe condition. *Zawistoski v. Gene B. Glick Co.*, 727 N.E.2d 790, 793 (Ind.Ct.App.2000). Exculpatory clauses are inconsistent with this principle of tort law. Exculpatory clauses discourage residential landlords from meeting the duty imposed on them by law for the protection of society. *See Taylor*, 412 So.2d at 765 (Faulkner, J. concurring specially). Tort law imposes liability for unsafe products, unsafe food, and unsafe premises. "It makes little sense for us to insist, on the one hand, that a workman have a safe place in which to work, but, on the other hand, to deny him a reasonably safe place in which to live." *McCutcheon*, 79 Wash.2d at 450, 486 P.2d at 1097. The best way to promote the exercise of due care is to hold residential landlords liable for their own negligence. Permitting landlords to insulate themselves from potential liability for negligently maintaining common areas serves only to encourage those landlords who are irresponsible, however few they may be, not to take reasonable steps to maintain their properties. It can hardly be in anyone's interest to sanction poor maintenance that can easily cause dangerous conditions in common areas. Tenants are not the only people at risk on poorly maintained premises. Any member of the public may enter the premises and be injured as a result of a landlord's failure to exercise due care. The public has an interest in protecting itself from such injury.

With these thoughts in mind, we conclude that the five factors outlined by our supreme court weigh in favor of not enforcing this type of clause in residential leases. Those factors include: (i) the nature of the subject matter of the contract; (ii) the strength of the public policy underlying the statute; (iii) the likelihood that refusal to enforce the bargain or term will further that policy; (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties relative bargaining power and freedom to contract. *Trotter*, 684 N.E.2d at 1152–53. Given the vast number of people clauses like these affect, the inequality of bargaining power caused by the need for housing, the fact that people who are not parties to the contracts could suffer as a result of such

---

**3.** According to the U.S. Census Bureau, Indiana had 667,000 rental housing units in 2000. U.S. Census 2000 summarized on *http://www.ibrc.indiana.ed u/population/census2000/c2k0517—analysis.pdf.* Because this figure refers only to the rental units and not to the number of occupants, the number of people who actually live in such units likely far exceeds that number.

clauses, and the desire to promote responsible maintenance by landlords to avoid personal injuries by tenants and third parties, we find that the factors weigh in favor of public policy. Based on the foregoing, we conclude that the exculpatory clause in this residential lease is contrary to public policy insofar as it seeks to immunize Ransburg against damages caused by her negligence, if any, in maintaining common areas.[4] Therefore, Ransburg was not entitled to judgment as a matter of law, and the trial court properly denied her summary judgment motion.

### Conclusion

An exculpatory clause of the type here involved contravenes long established common law rules of tort liability that exist in the residential landlord-tenant relationship. As so employed, it offends the public policy of the state and will not be enforced by the courts. The trial court did not err in denying Ransburg's summary judgment motion.

Affirmed.

DARDEN, J., concurs.

NAJAM, J., dissents with separate opinion.

NAJAM, Judge, dissenting.

I respectfully dissent. The majority opinion nullifies a valid private agreement, rewrites the lease, and reallocates the exchange of costs and benefits between the parties. The majority declares that the exculpatory clause in question is void and unenforceable because it "contravenes long established common law rules of tort liability" and "offends the public policy of the state." In making this new rule the majority assumes what it seeks to prove, namely, that the law of negligence and the law of contract occupy mutually exclusive spheres and cannot be reconciled on these facts, notwithstanding a body of Indiana law to the contrary. The majority ignores the plain meaning of the exculpatory clause and violates the well-settled common law right of the parties to make such a provision and to have it enforced according to its terms. In so doing, the majority has unilaterally altered the economic equation in countless residential leases across the state.

Indiana courts recognize the principle that parties are free to enter into contracts and, indeed, presume that contracts represent the freely bargained agreement of the

---

**4.** The dissent refers to House Bill 1013, which becomes effective July 1, 2002. The dissent points to language relating to damages for personal injuries, which was removed by the Senate Judiciary Committee and posits that "if enacted, the provision would have modified the common law and, in its operation and effect, would have prohibited exculpatory clauses in residential leases."

Our decision today is consistent with the statute as enacted. The new statute imposes various duties on landlords, including the duty to make "all reasonable efforts to keep common areas of a rental premises in a clean and proper condition." Public Law No. 92–2002 (to be codified as Indiana Code Section 32–31–8–5(3)). The statute further provides that a waiver of this duty is void. Subject to certain prerequisites, the statute creates a

cause of action tenants may bring to enforce landlords' obligations, permitting inter alia the recovery of actual and consequential damages. Thus, despite the dissent's mischaracterization of it, the statute specifically precludes landlords from using exculpatory clauses such as the one at issue here to contract away their liability for damages caused by failing to satisfy their duty to maintain common areas and permits tenants to proceed against landlords who fail in that duty. This remains the case despite the removal of the language cited by the dissent. The new statute is consistent with the public policy underlying our decision today, and we reject the notion that we are in some way "usurping" the role of the legislature by promoting sound public policy.

parties. *Fresh Cut, Inc. v. Fazli,* 650 N.E.2d 1126, 1129 (Ind.1995). Where the language of an instrument is unambiguous, the intent of the parties is determined from its "four corners." *Orme v. Estate of Kruwell,* 453 N.E.2d 355, 356 (Ind.Ct.App. 1983); *see Zawistoski v. Gene B. Glick Co., Inc.,* 727 N.E.2d 790, 792 (Ind.Ct.App. 2000) (interpreting residential lease). The construction or legal effect of a contract is a question of law to be determined by the court. *Id.*

It is well established in Indiana that parties are permitted to agree in advance that one is under no obligation of care for the benefit of the other, and shall not be liable for the consequences of conduct that would otherwise be negligent. *Powell v. American Health Fitness Ctr. of Fort Wayne, Inc.,* 694 N.E.2d 757, 760 (Ind.Ct. App.1998). Further, it is well settled in Indiana that contracts containing exculpatory agreements are not against public policy. *Marsh v. Dixon,* 707 N.E.2d 998, 1000 (Ind.Ct.App.1999); *see Weaver v. American Oil Co.,* 257 Ind. 458, 276 N.E.2d 144, 148 (Ind.1971). Parties to a lease may agree to exculpate one of them from his own negligence. *See Loper v. Standard Oil Co.,* 138 Ind.App. 84, 211 N.E.2d 797, 800 (1965) (upholding commercial lease provision that indemnified landlord against its own negligence); *see also Vertucci v. NHP Mgmt. Co.,* 701 N.E.2d 604, 606–07 (Ind.Ct.App.1998) (concerning residential lease exculpatory clause).[5]

Here, both parties agree that they entered into a residential lease contract that contains, in part, the following exculpatory language:

> [W]alkways, stairways, *parking lots,* lawns and all other areas and equipment to be used in common by all occupants of the apartment building and grounds, are provided and maintained gratuitously by [Ransburg], and ... [Ransburg] shall, in no event, be or become liable thereby for any loss, or damage, to person or property ... *even though such loss or damage shall be caused by the negligence of [Ransburg], or its agents, servants or employees.*

Appellant's App. at 78 (emphases added). The facts in this case correspond exactly with the circumstances contemplated by the exculpatory clause. Richards contends that Ransburg was negligent in clearing the parking lot of snow and ice. But the lease clearly provides that Richards will use the common area at her own risk and that Ransburg shall not be or become liable for her own negligent acts, including maintenance of the parking lot where Richards slipped and fell.

The majority acknowledges this state's "strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties," and that "exculpatory clauses are generally enforced and are not void on public policy grounds...." But the majority then discards these principles and declares instead that the question of whether a residential lease, which insulates the landlord from his own negligence, is unconscionable and

---

**5.** In *Franklin Fire Ins. Co. v. Noll,* 115 Ind. App. 289, 58 N.E.2d 947, 951 (1945), this court recognized the propriety of exculpatory clauses in leases as follows:

> Stipulations between a landlord and tenant, determining which shall bear a loss arising from nonrepair or misrepair of the tenement, and which shall be immune, are not matters of public concern. Moreover, the two stand upon equal terms; neither the one nor the other is under any form of compulsion to make the stipulations; either may equally well accept or refuse entry into the relationship of landlord and tenant. We think it clear that public policy does not condemn the immunity clause voluntarily agreed upon by these parties.

(Citation omitted).

therefore void as against public policy "has never been specifically addressed in Indiana." By phrasing the question in this manner, the majority attempts to distinguish residential leases from other types of leases or contracts in which exculpatory provisions have been upheld.

There is no such distinction. It has long been the law in Indiana that a lease is to be construed in the same manner as any other contract. *Zawistoski*, 727 N.E.2d at 792. This principle applies to commercial leases. *See Loper v. Standard Oil Co.*, 138 Ind.App. 84, 211 N.E.2d 797, 800 (1965). And Judge Darden, writing for our court, recently reaffirmed that this principle also applies to residential leases. *See Smyrniotis v. Marshall*, 744 N.E.2d 532, 534 (Ind.Ct.App.2001) (citing *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind.Ct.App.1997)).

Further, the issue of whether residential apartment leases are adhesion contracts and unconscionable and, therefore, void as against public policy has already been decided by this court. In *Nylen v. Park Doral Apartments*, 535 N.E.2d 178, 184 (Ind.Ct.App.1989), *trans. denied,* we acknowledged our supreme court's opinion in *Weaver,* that a contract may be declared unenforceable due to unconscionability when there is a great disparity in bargaining power which leads the party with the lesser power to sign a contract unwillingly and unaware of its terms. But the contract must be one that no sensible person not under delusion, duress or in distress would make, and one that no honest and fair person would accept. *Id.* In *Nylen* we held that a standardized residential lease agreement signed by three college students was not unconscionable. We stressed that contracts are not unenforceable simply because one party enjoys an advantage over the other. *Id.* at 185. The fact that the lease in *Nylen* contained terms favorable to the landlord did not render that lease unconscionable. *Id.*

Here, neither does the fact that the exculpatory clause benefits Ransburg more than Richards render that provision unenforceable. The majority points to no evidence that Richards signed the lease under compulsion or duress. The majority also fails to demonstrate why residential lessees, such as Richards, are so disadvantaged that they deserve special "immunity" from exculpatory clauses—a protection this court has never bestowed upon a particular class of lessees.[6]

Richards entered this lease agreement after having been trained as a paralegal. She renewed her year-to-year lease in May 1995, and she fell in January 1997. Richards had an opportunity to terminate or renegotiate the lease terms, but she renewed the lease, even after Ransburg had informed her that the monthly rent would

---

6. This court has upheld exculpatory clauses in contracts where the "public policy" concerns were far more compelling than those presented by the lease here. In *LaFrenz v. Lake Co. Fair Bd.*, 172 Ind.App. 389, 360 N.E.2d 605, 608 (1977), we addressed whether a patron killed at a demolition derby, who had signed an exculpatory agreement in order to receive a "pit pass" so that she could assist her husband as a mechanic, had bargained away her right to sue the Fair Board. In upholding the exculpatory clause, we concluded that there was no unequal bargaining power between the parties and that the victim was under no compulsion, economic or otherwise, to be in the restricted pit area. *Id.*

Likewise, in *Marshall v. Blue Springs Corp.*, 641 N.E.2d 92, 96 (Ind.Ct.App.1994), we refused to declare unconscionable a "liability release" signed by a scuba diving student prior to taking lessons who was subsequently injured. In so holding, we noted that Marshall chose to take the scuba lessons for his own enjoyment and was under no compulsion by any outside source to undertake the lessons. *Id.*

be increased by more than $100 per month. These facts neither suggest a great disparity of bargaining power nor that Richards was unwilling and unaware of its terms when she signed the contract on at least two occasions. *Nylen*, 535 N.E.2d at 184.

The majority attempts to distinguish this case from *Vertucci*. There, we considered the effect of an exculpatory clause in a residential lease where the tenant had been the victim of a sexual assault. *Vertucci*, 701 N.E.2d at 606–07. By first considering whether the exculpatory clause controlled the outcome, we acknowledged that such provisions are not against public policy. Otherwise, we would have had no reason to determine whether the exculpatory clause applied to shield the landlord from liability. The majority attempts but fails to reconcile its opinion with *Vertucci*.

While I would hold that the exculpatory clause here does not violate public policy, that conclusion does not end the ultimate enquiry. Notwithstanding the parties' clear intention to insulate Ransburg from its own negligence, the language of the exculpatory provision must be legally sufficient to accomplish that goal. This court has held that an exculpatory clause will not act to absolve the drafting party from liability unless it "specifically and explicitly refer[s] to the negligence of the party seeking release from liability." *Marsh*, 707 N.E.2d at 1000 (citation omitted). This rule is based on the principle that an agreement to release a party from its own negligence must clearly and unequivocally manifest a knowing and willing commitment by one party to pay for damages occasioned by the negligence of the other party. *Id.* An exculpatory clause that does not refer to the negligence of a releasee is void to the extent it purports to release the party from liability caused by its own negligence. *See Marsh*, 707 N.E.2d at 1000.

Here, the exculpatory clause unambiguously states that Ransburg will not be liable for those losses or damages "caused by the negligence of [Ransburg], or its agents, servants or employees." This language demonstrates the parties knowing and willing commitment to release Ransburg from liability for damages resulting from her own negligence. *See Clanton v. United Skates of America*, 686 N.E.2d 896, 901 (Ind.Ct.App.1997) (upholding exculpatory clause where plaintiff agreed to release defendant from liability for any injury which arose from his "use of or presence upon the [f]acilities ... whether or not caused by the negligence or other fault of [defendant]"). The majority opinion nullifies the clause, ignores the agreement of the parties, and, by declaring the clause void as against public policy, re-writes Indiana law.

Freedom of contract is a common law right. Our legislature has declared that the common law governs this state when it is not inconsistent with our constitutions and statutes. *See* Ind.Code § 1–1–2–1. As our supreme court stated in *Johnson v. Scandia Assoc., Inc.*, 717 N.E.2d 24, 29 (Ind.1999), contracts are private, voluntary allocations by which two or more parties distribute specific entitlements and obligations. When a landlord enters a residential lease, she voluntarily confers certain rights upon the tenant in consideration of the tenant's promise to pay rent, not waste the property, use it for illegal purposes, or "holdover" beyond the term. *Id.* The landlord agrees to this legal relationship after balancing the costs and benefits, and the same is true for the tenant. *Id.*

The parties to a lease have the right to define their mutual rights and obligations. *Jennings Realty Corp. v. First Nat'l Bank*

*of North Vernon,* 485 N.E.2d 149, 152 (Ind. Ct.App.1985). It is not within our province to make a new contract for the parties or to ignore or eliminate any provisions in the instrument. *Id.* The majority opinion violates the rights associated with freely bargained for contracts and the rights incident to real property ownership. Ransburg's right, as a property owner, to control the use of her private property is an essential feature of our economic system. The rights associated with ownership of property include the right to possess, enjoy, sell, destroy, or otherwise control the use of the property. *See* HENRY N. BUTLER, ECONOMIC ANALYSIS FOR LAWYERS, p. 357 (1998). In free market economies, the rights of ownership are typically enforced, not thwarted, by the government. *Id.*

Finally, the majority usurps the role of the legislature when it invokes "public policy" to justify its opinion. The flaw in the majority's reliance on "public policy" is underscored by recent legislation. The 2002 session of the Indiana General Assembly enacted a bill that regulates residential leases, House Bill 1013, which becomes effective July 1, 2002. The new legislation was enacted some twenty-six years after landlord-tenant legislation was first introduced in the General Assembly and is the best evidence of the public policy of our state on this issue. It is significant that the Senate Committee on Judiciary deleted from House Bill 1013 as introduced a provision that would have created a tenant's cause of action against a landlord for "any damages for personal injuries," and would have made any attempt to waive such an action, by contract or otherwise, void. If enacted, the provision would have modified the common law and, in its operation and effect, would have prohibited exculpatory clauses in residential leases. Now, the majority opinion has invoked "public policy" to accomplish by judicial decree precisely what the General Assembly has declined to do.[7]

Our supreme court supports the traditional precaution against the reckless use of public policy as a means of invalidating contracts and has emphasized that the power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power. *Hogston v. Bell,* 185 Ind. 536, 112 N.E. 883, 885 (1916); *Straub v. B.M.T. by Todd,* 645 N.E.2d 597, 599 n. 3 (Ind.1994). Our courts should not invoke "public policy" to nullify an otherwise valid private agreement, except as a last resort, and then only where the legal justification is clear, compelling and unavoidable. We tinker with private contracts at great peril. In so doing we jeopardize the freedom our citizens enjoy to make agreements by which they voluntarily allocate their respective rights, risks and responsibilities.

---

7. The majority contends that this point is a "mischaracterization" of the statute. The majority also asserts that its opinion is "consistent with the statute as enacted," in that the statute imposes a duty on a landlord to "make all reasonable efforts to keep common areas of a rental premises in a clean and proper condition," which cannot be waived. *Id.;* Public Law No. 92–2002. The majority insists that this language "specifically precludes" landlords from disclaiming their own negligence. But the majority errs when it equates "all reasonable efforts" with "all non-negligent efforts." And the majority ignores the fact that our legislature considered and rejected a provision that would have given tenants a right to recover for "personal injuries" a statutory remedy that undoubtedly contemplated a negligence cause of action. It is just as important to recognize what a statute does not say as it is to recognize what it does say. *City of Evansville v. Zirkelbach,* 662 N.E.2d 651, 654 (Ind.Ct.App.1996), *trans. denied.* The legislative history is clear. Had the legislature wanted to prohibit landlords from disclaiming their own negligence, it would have included such a provision in the statute. It did not.

The exculpatory clause here lawfully shields Ransburg from liability against Richards' negligence claim. We should reverse the trial court's denial of summary judgment and order that summary judgment be entered in favor of Ransburg. For these reasons, I respectfully dissent.